**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**WANDA SAVAGE**,

                Plaintiff,

              v.                       Case No. 15-cv-00791 (CRC)

**ALEX AZAR, Secretary, U.S. Department**
**of Health and Human Services**,[1]

                Defendant.

---

## MEMORANDUM OPINION

Plaintiff Wanda Savage worked for the U.S. Department of Health and Human Services from 2008 to 2014. She claims that, during her tenure, the Department took a host of discriminatory and retaliatory actions against her based on her race, sex, and disability status; that it retaliated against her for filing a complaint with the Equal Employment Opportunity Commission; and that it failed to reasonably accommodate her disability. The Department has moved for summary judgment. For the reasons that follow, the Court will grant the motion in part and deny it in part.

### I. Background

#### A. Factual History

##### 1. Savage's History with the Department

Throughout her time at the Department, Ms. Savage worked in the Office of the Assistant Secretary for Preparedness and Response, created after Hurricane Katrina "to lead the nation in

---

[1] Having succeeded Sylvia Mathews Burwell as Secretary of the Department, Alex Azar has been automatically substituted as the defendant pursuant to Federal Rule of Civil Procedure 25(d).

preventing, preparing for, and responding to the adverse health effects of public health emergencies and disasters." Public Health Emergency, <u>U.S. Dep't Health & Human Servs.</u>, https://perma.cc/FPB4-XQ9F (last visited March 26, 2018). Savage was hired to work in a sub-office called the Office of Financial Planning and Analysis ("OFPA"). Decl. of Belinda Thomas Blackwell Supp. Mot. Dismiss ("Thomas Blackwell Decl.") at 1 (ECF No. 44-3). She began working in September 2008 as a Senior Program Analyst for OFPA's Management Assurance Division. <u>Id.</u> Ex. 1. She was hired at the GS-15 level and served as a "Team Leader" in the Division. <u>Id.</u> At the time, Savage's immediate supervisor was Brian Sparry, who was Deputy Director for the Division, a white male and, like Savage, a GS-15 employee. Decl. of John Joseph Petillo Supp. Mot. Dismiss ("Petillo Decl. I") ¶ 2 (ECF No. 44-4). Her higher-level supervisor was OFPA's Director, John ("Jay") Petillo. <u>Id.</u>

In March 2009, Petillo granted Mr. Sparry a schedule change that allowed him to begin work at 7:00 AM and leave at 3:30 PM. Sparry had applied for this modified schedule as an accommodation for a recent heart attack. <u>See</u> Pl.'s Opp'n Mot. Summ. J. Ex. 5, at 135–36. While the Department did not conclude that Sparry's condition amounted to a protected disability, Petillo allowed the reduced schedule anyway because of Sparry's heart condition and because of a divorce agreement that required Sparry to be home during certain hours. <u>Id.</u> at 136.

Around this same time, Petillo authorized Savage to change to a compressed "5/4/9" schedule—working nine out of every ten days, but for nine hours (instead of eight) for most of those days. Pl.'s Opp'n Mot. Summ. J. Ex. 5, at 134–136. As Team Leader, Savage covered for Sparry when he was out of the office. <u>Id.</u> at 146.

Savage found the job very stressful and unpleasant, and in several emails to Petillo throughout 2009 she complained about the Division's dysfunction. <u>See</u> Pl.'s Opp'n Mot.

Dismiss ("Pl.'s MTD Exs.") at 87, 92, 126–27 (ECF No. 48).[2] While the details and frequency of their communication are disputed, it is not disputed that in March 2009 she emailed Petillo that she wanted to be reassigned outside of the Management Assurance Division. See id. at 92. Petillo attempted to find Savage a position in the Department's Office of Finance, but the supervisor of that office informed him that she was not interested in accepting Savage for the position. Depo. of John Joseph Petillo at 107–08 (ECF No. 82-1).

Meanwhile, in April 2009, Savage had filed the first in a series of administrative complaints with the Equal Opportunity Employment Commission ("EEOC"). She alleged that she was subjected to a host of adverse actions because of her race, sex, and disability status. Pl.'s Opp'n Mot. Summ. J. Ex. 16, at 2. Petillo was interviewed by an EEOC investigator about at least one of these complaints. Id. Ex. 11, at ¶ 5.

Mr. Sparry was transferred from the Management Assurance Division to OFPA's Communications Office in November 2009. Petillo Decl. I ¶ 3. He had sought this transfer as an accommodation for his heart condition and because the job caused him "extreme stress." Pl.'s MTD Exs. at 272. A memorandum addressed from Petillo to Sparry explained that, while the Department concluded that his condition was not a disability for purposes of the Rehabilitation Act, he would nevertheless grant the transfer request. Pl.'s Opp'n Mot. Summ. J. Ex. 2. Once Sparry left the Division, Petillo designated Savage as its Acting Deputy Director. Petillo became Savage's direct supervisor. Petillo Decl. I ¶ 2.

_____

[2] Savage's opposition to the Department's previous motion to dismiss is a single 510-page document containing her sworn declaration, several email threads, and other employment-related documents. Because Savage did not assign these documents consistent exhibit and page numbers, the Court will cite these documents using the page numbers generated by ECF.

The parties dispute the extent to which Savage's job duties changed once she became Acting Deputy Director. Petillo, citing Savage's performance plans and evaluations (or "PMAPs"), maintains that her responsibilities remained largely the same, and that the assumption of the title of Acting Deputy Director was merely nominal. Petillo Decl. I ¶¶ 4–7; id. Ex. 1–3. Savage counters that these same PMAPs demonstrate that she performed supervisory duties distinct from her previous role. Pl.'s MTD Exs. at 66. Petillo stated that the Division's responsibilities were greatly reduced, and that he gave Savage ample staff and resources to run the Division. See Second Supp'l Decl. of John Joseph Petillo Supp. Mot. Summ. J. ("Petillo Decl. II") ¶ 3 (ECF No. 82-1 at 116–17). Savage disagreed; she told Petillo that the Division was understaffed and underresourced. Pl.'s MTD Exs. at 111.

Savage was Acting Deputy Director for almost two years. For part of this time, she was on medical leave following a surgery and then worked remotely. Petillo Decl. II ¶ 6. Things remained rocky, however—Savage sought a transfer out of the Division in April 2010, this time in a three-page email to a human resources officer. Pl.'s MTD Exs. at 148–50.

By January 2011, Savage had returned to the office and was working on her 5/4/9 schedule. That March, Petillo asked Savage whether she would be interested in assuming the Deputy Director role permanently. Petillo Decl. I ¶ 8. He explained that she—like all permanent Deputy Directors—would be required to give up her 5/4/9 schedule because the Department preferred supervisors to be in the office all the time. Id.; see also Pl.'s Opp'n Mot. Dismiss at 228–30. Savage, not wanting to relinquish her schedule, declined the position. Petillo Decl. I ¶ 9. A few months later, Petillo advertised the job throughout HHS. Id. Savage applied and, along with five other candidates, was selected for an interview. Id. ¶ 11. A panel of four employees interviewed those six candidates and recommended that Petillo choose Javier Lopez

(a Hispanic male) for the position. Id.; see Blackwell Thomas Decl. Ex. 19. After reviewing the candidates' written materials, contacting their references, and consulting with the interview panel, Petillo hired Lopez, who began working in October 2011. Petillo Decl. I ¶ 12.

When Lopez began as Deputy Director, Petillo notified Savage that he would be reassigning her outside the Management Assurance Division: effective January 2012, she would become a Records Management liaison for OFPA and would report directly to Petillo. Id. ¶ 21; see Pl.'s MTD Exs. at 280–81. Petillo explained in a memorandum addressed to Savage that he had made the assignment "[i]n response to [her] stated dissatisfaction in your current role." Pl.'s MTD Exs. at 280. Savage did not want to be transferred and sent emails to that effect to Petillo and other Department officials. Petillo Decl. I ¶ 21. Department management attempted to mediate the issue, but those efforts were unsuccessful, and in January Petillo reassigned Savage as planned. Id. Savage worked in her new position for nearly three years until she was terminated from the Department in 2014. Id. ¶ 2. (That ultimate termination is not relevant to this lawsuit.)

### 2. Savage's Accommodation Requests

Savage had been injured in a car accident in 2007 and experienced complications from knee surgeries following the accident. Pl.'s Opp'n Mot. Summ. J. Ex. 24, at 1–2. During her employment with the Department, she requested accommodations related to injuries stemming from the accident and surgeries. In March 2011, Savage lodged a request with the Department's human resources department seeking two accommodations: an office large enough for ergonomic equipment, and permission to work remotely from her home. Decl. of Christopher Tully Supp. Def.'s Mot. Summ. J. ("Tully Decl.") Ex. 1, at Bates No. 25-2358 (ECF No. 80-3). Savage authorized the Department to seek her medical records from her orthopedic surgeon, Dr.

Peter Glieberman, to corroborate her request.  Id. at 25-2308.  The request was forwarded to Federal Occupational Health—an agency that reviews accommodation requests—which assigned it to one of its staff physicians.  Id. at 25-2349, -2354.  In April, that physician faxed Dr. Glieberman a series of questions about Savage's condition and evaluation.  Id. at 25-2325.  The fax was confirmed as received, but Dr. Glieberman never responded.  Unable to reach Dr. Glieberman after several attempts, in May 2011 Federal Occupational Health notified the Department's human resources officer that it lacked "sufficient information to determine whether or not Ms. Savage is a person with a disability, nor to make a recommendation in this case.  Should further information become available, her case can be reconsidered."  Id. at 25-2349.

In September 2011, at the Department's urging, Federal Occupational Health tried twice more to call Dr. Glieberman and sent him another fax.  Id. at 25-2313 to -2314.  It still received no response and informed the Department that it had been unsuccessful.  Id. at 25-2309.  A month later, Petillo informed Savage by letter that he was denying her accommodation requests, as Federal Occupational Health had not received the necessary documentation of her condition from her medical providers.  Id. at 25-2302 to -2303.  The letter concluded, "If in the future, you do provide documentation from your physician establishing medical need and [Federal Occupational Health] recommends that your requests should be granted, I will be happy to reconsider my decision."  Id. at 25-2303.

Several months later, in January 2012, Savage sent Petillo copies of her MRI results, which he forwarded to human resources the same day.  Id. at 25-2296 to -2298.  The next day, Petillo provisionally approved Savage for full-time telework.  Id. at 25-2204 to -2205.  Federal Occupational Health then reviewed the MRIs and, in June 2012, Petillo formally approved Savage for a three-month period of telework, subject to renewal.  Tully Decl. Ex. 2, at Bates No.

25-912 to -916 (ECF No. 80-3).  Savage's telework arrangement was consistently renewed until she left the Department.

Regarding her request for a larger office:  Before her period of medical leave, Savage had a 91-square-foot office in the Hubert H. Humphrey Building in Southwest Washington, D.C.  Id. at 25-502.  When she returned in January 2011, she was assigned to a 110-square-foot office in the Mary E. Switzer Building—located across the street from her old building—to allow for the installation of ergonomic equipment she had previously requested.  Id.  Still seeking more space, Savage in February told Petillo that she had noticed a larger office that was empty and asked if she could move into it.  Id. at 25-1358 to -1359.  Petillo asked an OFPA administrator about the office and learned that it was being held for a new employee beginning in March, and that the new employee needed that particular office because it was close to others in his division.  Id. at 25-1352, -1357.  The administrator told Petillo, however, that he would be on the lookout for a larger office, and that he would bring in an ergonomics contractor to inspect Savage's current office.  Id. at 25-1352.

Scheduling this ergonomics inspection proved difficult.  The Department's usual contractor, Ergonetics, told the Department that it was not available for the inspection.  Id. at 25-1314.  Before hiring another contractor, the Department learned that a military entity called CAPTEC could perform an ergonomics evaluation at no cost.  Id. at 25-1311.  The Department instructed Savage to sign up for an evaluation directly with CAPTEC, and gave her the necessary information to do so in March.  She requested the evaluation in late April and scheduled an office visit for May 4.  Id. at 25-692 to -695.

Meanwhile, the Department had signed a lease for office space at another building a few blocks southwest called "Patriots Plaza 2."  Savage was slated to move to a 120-square-foot

office in that new facility.  Id. at 25-532.  During its May evaluation, CAPTEC evaluated

Savage's current office in the Switzer Building but did not inspect her expected new office at

Patriots Plaza 2.  Id.  It recommended that Savage work with the Department to telework and "to

obtain a larger office location to allow her to utilize her assistive technology equipment," noting

that "the current office configuration does not allow her adequate room to adjust her keyboard

tray and monitor arm in proper ergonomic positions."  Id. at 25-537 to -538.  Savage had a

meeting in June with Petillo and several Department administrators, where they agreed that an

administrator would visit Savage's Patriots Plaza office, measure its space, and compare its size

to the office that Savage had previously requested in the Switzer Building.  Id. at 25-508.

Savage received the measurements of her Patriots Plaza office (120 square feet) and the Switzer

Building office (132 square feet).  Id. at 25-502.  Savage then moved to the Patriots Plaza office

in July.  Id. at 25-496.  She sent several emails to Petillo and Department administrators stating

that the office still was not large enough for her equipment and supplies.  Id. at 25-487 to -498.

The Department explained that no larger office was available but that it was willing to work with

Savage to reconfigure the space to allow for better functionality.  Id. at 25-1284.  There is no

record of further communications regarding Savage's office space after August 2011.  See id. at

25-1279 to -1281.

There were also issues getting Savage's ergonomic equipment set up after she returned in

January 2011.  The trouble began when the vendor was late in delivering the equipment shortly

after her return.  Tully Decl. Ex. 1, at Bates No. 23-849 (ECF No. 80-3).  This led to a prolonged

back-and-forth between Savage, Petillo, and several Department administrators about the

installation of various pieces of ergonomic equipment, including a computer monitor arm, a new

mouse, a document holder, and a magnifier.  Id. at 23-851 to -855.  The requested equipment was

eventually installed and it appears that issues regarding the equipment were resolved by July 2011.  Tully Decl. Ex. 2, at 25-488 (ECF No. 80-3).

B.  Procedural History

In October 2014, Ms. Savage filed a fifteen-count *pro se* complaint in the U.S. District Court for the Central District of California alleging various discrimination claims arising out of her employment with the Department.  That court dismissed all of the defendants except for the Department's Secretary in her official capacity and ordered the case transferred to this Court.

On the Department's motion, this Court in August 2016 dismissed many of Savage's claims with prejudice and granted summary judgment against several others.  See Savage v. Burwell, 2016 WL 4132196, at *1 (D.D.C. Aug. 3, 2016).  The Court, however, denied summary judgment with respect to a handful of Savage's claims, finding that—at least with no discovery having yet been conducted—there remained material factual disputes about each of those claims. Id. at 5–9.

Savage then filed this amended complaint, again *pro se*.  In it, she reiterated the claims on which the Court previously denied summary judgment.  First, she alleged that the Department discriminated against her by refusing to transfer her out of the Acting Deputy Director position, by denying her training opportunities and work resources while serving as Acting Deputy Director, by selecting another candidate (Javier Lopez) for the permanent Deputy Director position, and by subsequently reassigning her out of her division.  Savage contends that the Department took these actions because of her race, sex, and disability status.  She also alleges that the Department took those same actions—and gave her worse performance evaluations—in retaliation for her filing administrative complaints with the Equal Opportunity Employment

Commission. Finally, Savage claims that the Department violated the Rehabilitation Act by failing to reasonably accommodate her disability.[3]

The Department has moved for summary judgment on all of Savage's claims. Savage, now with the aid of counsel, has opposed that motion.

## II. Legal Standard

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must accept as true the nonmovant's evidence and draw all reasonable inferences in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The nonmovant may not, however, rely on "mere allegations" or conclusory statements. Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).

## III. Analysis

### A. Discrimination Claims

Savage first asserts that the Department took several employment-related actions against her based on her race and sex, in violation of Title VII of the Civil Rights Act of 1964, and based on her disability status, in violation of the Rehabilitation Act of 1973. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Rehabilitation Act

---

[3] In her amended complaint, Savage also claimed that the Department violated the False Statements Accountability Act, 18 U.S.C. § 1001. Because she does not mention this claim in her opposition to the Department's motion for summary judgment, however, the Court considers it abandoned. See Aliotta v. Bair, 614 F.3d 556, 562–63 (D.C. Cir. 2010) (explaining that claims raised in complaint may be abandoned at summary judgment). Even if it were not, the Court would be forced to dismiss the claim because the D.C. Circuit has held that § 1001 contains no private right of action. Lee v. USAID, 859 F.3d 74, 78 (D.C. Cir. 2017).

similarly protects against discrimination based on an individual's disability status. 29 U.S.C. § 724(a); see id. § 724(d) (explaining that courts reviewing claims under the Rehabilitation Act should apply the standards used in claims under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*).

Because there is no direct evidence of discrimination on any of these axes, Savage's claims are governed by the three-step framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1306 (D.C. Cir. 1998) (en banc) (applying McDonnell Douglas framework to disability discrimination claims). The plaintiff can establish a prima facie case of discrimination by showing that she is a member of a protected class, she suffered an adverse employment action, and "the unfavorable action gives rise to an inference of discrimination." Forkkio v. Powell, 306 F.3d 1127, 1130 (D.C. Cir. 2002). The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employment action. McDonnell Douglas, 411 U.S. at 802. The plaintiff then must rebut that nondiscriminatory reason "by proving, under a preponderance of the evidence standard, that the employer's justification is merely pretext for discrimination." Brown v. Sessoms, 774 F.3d 1016, 1023 (D.C. Cir. 2014). Savage could establish pretext using a variety of evidentiary sources, including "the employer's better treatment of similarly situated employees outside [her] protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

Here, the Department has offered legitimate, nondiscriminatory reasons for each alleged adverse employment action, and thus "the question whether the employee actually made out a prima facie case is 'no longer relevant.'" Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993)). Rather, the Court "must resolve one central question" with respect to each action: Has Savage "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" on the basis of her race, sex, or disability status? Id. at 494. The Department, however, remains free to argue that the action was not "materially adverse" and therefore not cognizable under the federal employment statutes. See Taylor v. Solis, 571 F.3d 1313, 1320–22 (D.C. Cir. 2009); see also Drielak v. McCarthy, 209 F. Supp. 3d 230, 239 (D.D.C. 2016) ("For discriminatory intent to be the relevant focus . . . the plaintiff must first establish that the employer's actions were indeed materially adverse."). For purposes of discrimination claims brought under Title VII and the Rehabilitation Act, an action is materially adverse if it affects "the terms, conditions, or privileges of employment or future employment such that a reasonable trier of fact could find objectively tangible harm." Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002). The statutes do not allow for claims based on "purely subjective harms" like "dissatisfaction with a reassignment, or public humiliation or loss of reputation." Id. (citations omitted).

With these standards in mind, the Court tackles Savage's four alleged acts of discrimination in turn.

*1. Refusal to transfer*

First, Savage claims that the Department's refusal to transfer her away from the Acting Deputy Director position was discriminatory. The Department in its brief does not contest that this decision was materially adverse.[4] It contends, however, that no reasonable jury could find that Savage was denied a transfer for discriminatory reasons.

The Court disagrees. To be sure, the Department has offered a nondiscriminatory reason for denying Savage a transfer. It contends that in requesting a transfer Savage did not specify an alternative position in the Department, but rather made vague requests that she wished to stop being Acting Deputy Director. Def.'s Reply at 9. It also points to evidence suggesting that Petillo's boss (and not Petillo himself) was responsible for prompting the transfer of other employees, and thus that no inferences can be gleaned from Petillo's subsequent refusal to transfer Savage. Def.'s Mot. Summ. J. at 33; see Pl.'s Opp'n Mot. Summ. J. Ex. 5, at 134–35.

But Savage has introduced evidence that would support an inference that the Department could have readily reassigned her out of the Acting Deputy Directorship, and that its stated reasons for denying her a transfer were a pretext for discrimination on the basis of race or sex.[5]

---

[4] While the Department has not raised this issue on summary judgment, at trial the burden would remain on Savage to show that, despite the lack of evidence that she sought a position with different pay or benefits, the Department's denial of a transfer was nevertheless an adverse employment action for purposes of Title VII. See Ortiz-Diaz v. U.S. Dep't of Hous. & Urban Dev., 869 F.3d 70, 73 (D.C. Cir. 2017) (explaining that the Title VII plaintiff "was required to show, among other things, that he suffered an adverse employment action."); id. at 74 (explaining that "lateral transfers to different positions within a Department offering the same pay and benefits are ordinarily not" materially adverse); cf. Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2003) (finding material adversity where plaintiff was denied transfer to a position that, despite its equality in pay and benefits, had "substantially greater supervisory authority").

[5] By contrast, there is no evidence that the Department acted on the basis of Savage's disability status. The Court will allow this discrimination claim to proceed only under Title VII, not under the Rehabilitation Act.

More specifically, there is evidence in the record supporting the following narrative: Sparry, a white male, requested a transfer out of the Management Assurance Division in June 2009 because of stress accompanying the job. Pl.'s MTD Exs. at 272. He was granted the requested transfer in November 2009. Petillo Decl. I ¶ 13. Another white male employee, Phillip Wise, was also reassigned out of the Division around this time. Decl. of Phillip Wise Supp. Def.'s Mot. Summ. J. ¶¶ 3–4 (ECF No. 82-1). Petillo reviewed and granted both of these reassignment requests. Pl.'s Opp'n Mot. Summ. J. Ex. 7. Savage sought a transfer on similar, stress-related grounds as Sparry in March 2009 and in April 2010. But Savage's request, unlike the other employees', was denied.

That story, if true, would be classic evidence of pretext. "One way to discredit an employer's justification is to show that similarly situated employees of a different race [or sex] received more favorable treatment." Royall v. National Ass'n of Letter Carriers, AFL-CIO, 548 F.3d 137, 145 (D.C. Cir. 2008); see also Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999). True, to ultimately prevail on her claim Savage would need to show "that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee." Burley v. Nat'l Passenger Rail Corp., 801 F.3d 280, 301 (D.C. Cir. 2015). But the "question of whether employees are similarly situated in order to show pretext 'ordinarily presents a question of fact for the jury.'" Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1115 (D.C. Cir. 2016) (quoting George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005)).

The Department does offer evidence supporting its argument that Sparry and Savage were situated differently at the time they requested transfers, such that no inference of discrimination can be gleaned from their differential treatment. Specifically, it points to evidence suggesting that Dr. Gerald Parker, Petillo's supervisor, urged Petillo to grant Sparry a

transfer but played no role in reviewing Savage's request.  See Depo. of John Joseph Petillo at 134–35 (ECF No. 82-1); Tully Decl. Ex. 5 (ECF No. 82-1).  It also points to Petillo's expressed belief that the Division was "dysfunctional" prior to Sparry's departure, Depo. of John Joseph Petillo at 44, and contends that this toxicity had dissipated by the time Savage sought to leave the Division, Def.'s Mot. Summ. J. at 32.  But the evidence on these points is not one-sided.  At least formally, Petillo was both Sparry and Savage's direct supervisor, which permits a reasonable inference that he played a substantial part in both transfer decisions.  Petillo also wrote an email to another Department employee in August 2009 suggesting that he wanted to transfer Sparry but did not believe he had the unilateral authority to do so.  Pl.'s Opp'n Mot. Summ. J. Ex. 3.  The Department's argument regarding the office atmosphere is also undermined by evidence that Savage found the environment highly stressful in April 2010, long after Sparry had departed.  Tully Decl. Ex. 1, at 23-718 (ECF No. 80-3).  A jury could consider the foregoing evidence and reasonably conclude that Sparry and Savage were similarly enough situated that the Department's refusal to transfer her (in light of its decision to reassign Sparry) was discriminatory.[6]  This is not a case where it is so clear from the record that the two employees (Savage and Sparry) were not similarly situated that the question can be resolved on summary judgment.  Cf., e.g., George, 407 F.3d at 415 (explaining that, as a matter of law, probationary employees and permanent employees generally not similarly situated).  The Court will deny summary judgment on this claim.

---

[6] It is worth noting that a fellow judge in this District denied summary judgment on a claim brought by another HHS employee, William Porter, based on the Department's decision to deny Porter a transfer but grant Sparry a transfer.  Porter v. Sebelius, 192 F. Supp. 3d 8, 15 (D.D.C. 2016).  As the court there explained, evidence showing that the Department "granted Sparry's transfer request but did not grant Porter's similar requests supports [his] assertion that [the Department's] reasons for the disparate treatment of Porter are pretextual."  Id.

### 2. Denial of training and work assignments

Savage also claims that during her time as Acting Deputy Director, the Department denied her effective training opportunities and work assignments for discriminatory reasons. The Department contends that these alleged denials were not materially adverse and thus do not give rise to a cause of action under Title VII or the Rehabilitation Act. Def.'s Mot. Summ. J. at 30. The Court agrees. Generally, denials like those Savage alleges do not rise to the level of material adversity. See Pauling v. District of Columbia, No. 13-cv-943, 2017 WL 6759086, at *16 (D.D.C. Dec. 29, 2017) ("[T]he mere denial of training opportunities does not constitute an adverse employment action."); Drielak, 209 F. Supp. 3d at 240 (finding that employee's "exclusion from meetings and work projects" was not materially adverse). Savage has introduced no evidence supporting her vague allegation that the lack of training and personnel left her unable to perform the job functions. Summary judgment against this claim is appropriate.

### 3. Nonselection for Deputy Director Position

Savage next alleges that the Department discriminated against her by declining to hire her as the Division's permanent Deputy Director. This is undoubtedly an adverse employment action. The Department asserts a nondiscriminatory reason for the action: that Javier Lopez was more qualified for the job based on his work experience, education, and references, and that members of the interview panel favored him over Savage. Declarations from the panel members bear out that proffered reason. See, e.g., Decl. of Famane Brown Supp. Mot. Dismiss (ECF No. 44-4). But Savage cites two sources of evidence that, in her view, demonstrate pretext.

Savage's principal pretext argument focuses not on the Department's selection of another candidate per se, but rather on the Department's initial offer to give her the permanent position

while she was Acting Deputy Director—*i.e.*, before the job was advertised. Again, it is undisputed that in March 2011, Petillo had a meeting with Savage to ask whether she was interested in taking on the position permanently. Petillo advised Savage that, if she were to accept the position on a permanent basis, she would no longer be able to work on her compressed 5/4/9 schedule. Savage preferred not to give up that schedule, so she declined the position. Petillo then advertised the position throughout HHS and ultimately selected Lopez.

In seeking to establish pretext, Savage homes in on Petillo's insistence that she relinquish her flexible schedule in order to take on the permanent Deputy Director role. In Savage's view, the legitimacy of that requirement is belied by four key facts: First, that she was allowed to keep her flexible schedule while performing the job in an acting role; second, that a Deputy Director working under Petillo in a different office was allowed to work remotely from Chicago, see Decl. of David Dolinsky Supp. Def.'s Mot. Summ. J. ¶ 2 (ECF No. 80-3); third, that despite her alternative work schedule she passed the initial screening when she ultimately applied for the job; and, fourth, that the Department *later* began allowing Deputy Directors to work on a compressed schedule.

These facts do not give rise to a reasonable inference of pretext. Even if Savage performed the full responsibilities of a permanent Deputy Director while acting in that role, it is perfectly understandable (and not suggestive of pretext) that an employer like the Department would impose a more stringent schedule requirement for a *permanent* supervisor than for a temporary substitute. Savage does not dispute that all permanent Deputy Directors were required to work a full five-day schedule, and she has not adduced any evidence that undermines the legitimacy of that requirement. Nor does the Department's differential treatment of another Deputy Director create a material dispute of fact regarding pretext. It is uncontested that Petillo

allowed the other Deputy Director to work remotely to entice him to stay at HHS, as he had been offered a job with a different federal agency. Decl. of David Dolinsky Supp. Def.'s Mot. Summ. J. ¶ 2. Savage therefore could not convince a reasonable factfinder that she her situation was virtually identical to this other Deputy Director's, such that their differential treatment would give rise to an inference of pretext. There is also nothing fishy about Savage having passed the initial screening when she applied for the permanent Deputy Director position despite her previous unwillingness to relinquish the compressed schedule. From the Department's perspective, Savage could have decided that she was willing to give up her alternative schedule. If anything, the Department's willingness to consider her application despite previously declining the position is simply evidence that it was hopeful she would change her mind regarding her schedule. Finally, as for the Department's subsequent allowance of flexible schedules for Deputy Directors, no reasonable jury could find that this change—which occurred several years after Savage sought the position, see Pl.'s Opp'n Mot. Summ. J. Ex. 5, at 179–80— exposes the schedule requirement as a fig leaf for discrimination.

In sum, none of this evidence suggests that Petillo insisted Savage relinquish her 5/4/9 schedule so as to deny her the permanent Deputy Director position on the basis of race, sex, or disability status. To find to the contrary, a jury would be required to engage in impermissible speculation in the face of the Department's proffered explanation: that no Deputy Directors were allowed to work on a 5/4/9 schedule and that Savage declined the position due to that requirement.

Savage also points to a second body of evidence to support her argument that the Department's selection of a different candidate for the job was discriminatory. She contends that, having successfully served as Acting Deputy Director, her nonselection in the face of that

directly relevant experience suggests that the Department's qualifications-based justification is a sham. But Savage's experience simply does not give rise to a reasonable inference that she was passed over for a discriminatory reason, and not for the neutral reasons that the Department has put forth. To create a material dispute regarding whether the Department's qualifications-based reasons for choosing Lopez were a pretext for discrimination, she must identify evidence from which a reasonable jury could conclude that she was "*significantly* better qualified for the job" than the selected person. Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006) ("In order to justify an inference of discrimination, the qualifications gap must be great enough to be inherently indicative of discrimination."). Absent such a gap, the Court will not allow a jury to "reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence that [the protected status] played a part in the decision." Stewart v. Ashcroft, 352 F.3d 422, 430 (D.C. Cir. 2003).

Savage's stint as Acting Deputy Director suggests that she was more qualified on one particular axis: direct experience with the job. (This assumes, of course, that the acting and permanent versions of the Deputy Directorship had the same responsibilities; this fact is hotly contested.) But the record does not support a reasonable inference that, on the whole, Savage was significantly better qualified for the job than Lopez. There is substantial evidence that Lopez had a more relevant educational background (in business and government management rather than in marketing) and on-point work experience (more broadly in federal government operations rather than narrowly in internal controls). Petillo Decl. I ¶¶ 13–14, 16, 18. This is not to mention Lopez's references: he listed a supervisor from a previous government job at the Department of Homeland Security and an Associate Dean from his graduate program, both of

whom strongly recommended him.  Id. ¶ 15.  Savage, on the other hand, listed two employees she had supervised in OFPA and Petillo himself.  Id. ¶ 19.

To extent that there was any qualifications gap at all between Savage and Lopez, it is not wide enough to support an inference that the Department selected Lopez for a discriminatory reason.[7]  The Court will grant summary judgment on Savage's claim that her nonelection for the permanent Deputy Director position amounted to unlawful discrimination.

### 4.  Transfer Out of the Management Assurance Division

Finally, Savage alleges that her subsequent reassignment outside of her division to the post of Records Management liaison was discriminatory.  The Department again raises a threshold argument that the transfer did not have a materially adverse effect on the conditions of her employment.  Def.'s Mot. Summ. J. at 38.  The Court agrees that, as a matter of undisputed fact, Savage's transfer was not sufficiently adverse to be actionable.

The D.C. Circuit has explained that "lateral transfers to different positions within a Department offering the same pay and benefits are ordinarily" not cognizable, even if paired with "subjective injuries, such as dissatisfaction with a reassignment." Ortiz-Diaz v. U.S. Dep't of Hous. & Urban Dev., 867 F.3d 70, 73 (D.C. Cir. 2017).  "Instead, a plaintiff denied a purely lateral transfer must show some other materially adverse consequence affecting the terms, conditions, or privileges of employment or future employment opportunities, whereby a reasonable trier of fact could find that he suffered objectively tangible harm." Id.

---

[7] "A plaintiff attacking a qualifications-based explanation is of course not limited to comparing his qualifications against those of the successful candidate." Aka, 156 F.3d at 1295. But Savage has not pointed to any other "flaws in the employer's explanation" that could give rise to an inference of pretext. Id.

It is undisputed that Savage received the same pay and benefits in her original and post-transfer positions. So the sole remaining question is whether the transfer had some other cognizable adverse effect. On summary judgment, Savage cannot rely on mere allegations of an objectively tangible harm—she must point to evidence in the record of such an effect. And there is no evidence from which a reasonable factfinder could conclude that Savage's transfer resulted in concrete, work-related harm. Her only real allegation of such a harm is that her experience and training were not well matched to the new position. But it is undisputed that Savage advertised her extensive experience in records management when applying for the Deputy Director position. Blackwell Thomas Decl. Ex. 16. Even if that were not true, Savage has not pointed to evidence suggesting that she was tangibly worse off in the Records Management position—for example, that the position was a dead-end job or that the transfer stripped her of supervisory responsibilities.[8] On the contrary, the fact that Savage consistently sought to leave the Management Assurance Division suggests that, if anything, the transfer outside the Division was favorable. The Court will grant summary judgment against Savage's claim that her transfer was discriminatory.

B. Retaliation Claims

In addition to alleging unlawful discrimination, Savage claims that the Department took the four just-discussed actions—refusing to transfer her; denying her training and work resources; denying her the permanent Deputy Director position; and subsequently reassigning her—in retaliation for her filing a complaint with the Equal Opportunity Employment

---

[8] To the extent that Savage lost any supervisory authority, that loss was the result of her nonselection for the permanent Deputy Director position, not her subsequent reassignment.

Commission ("EEOC") in 2009. She also alleges that she received lower performance evaluations after filing an EEOC complaint.

Title VII and the Rehabilitation Act "prohibit the federal government from retaliating against employees who complain of employment discrimination." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009) (Title VII); see also Solomon v. Vilsack, 763 F.3d 1, 5 (D.C. Cir. 2014) (Rehabilitation Act). The burden-shifting framework from McDonnell Douglas applies to retaliation claims just as with discrimination claims. To establish a prima facie case of retaliation, the employee must show (1) that she engaged in statutorily protected activity; (2) that she suffered a materially adverse action by her employer; and (3) that a causal link connects the two. Bernanke, 557 F.3d at 677. In the retaliation context, that causal connection must be stronger than in the discrimination context: a plaintiff must ultimately prove that retaliatory animus was the but-for cause of the adverse employment action. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).

As in the discrimination context, the employer may rebut this prima facie case by pointing to a legitimate, nonretaliatory reason for taking the action. If it does, the court should not scrutinize the strength of the plaintiff's prima facie case of retaliation. "[R]ather, the court should proceed to the question of retaliation *vel non*. The court can resolve that question in favor of the employer based either upon the employee's failure to rebut its explanation or upon the employee's failure to prove an element of her case," including "that her employer took a materially adverse action against her." Taylor v. Solis, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009).

It is undisputed that Savage engaged in protected activity by filing a discrimination complaint with the EEOC in April 2009, and then again in April 2011, March 2012, February

2013, and June 2014.[9]  See Pl.'s Opp'n Mot. Summ. J. Ex. 16.  These claims raised issues related to racial, gender, and disability discrimination.  Id. at 2, 4–5, 8.  She has also introduced evidence sufficient to survive summary judgment that Petillo was aware of these EEOC complaints.  Pl.'s Opp'n Mot. Summ. J. Ex. 11, at ¶ 5; see Bernanke, 557 F.3d at 679 ("To survive summary judgment . . . [a plaintiff] needn't provide direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did.").  And she has identified identified several actions that were materially adverse for purposes of a retaliation claim, all of which occurred after she filed her EEOC complaints.  The concept of material adversity is broader in the retaliation context than in the discrimination context, in that actions in the former context need not affect the "terms and conditions of employment."  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  Rather, a retaliatory action is "materially adverse" if it could "well dissuade a reasonable worker from making or supporting a charge of discrimination."  Id.  A jury could find that is the case with respect to (1) the Department's refusal to transfer Savage out of the Acting Deputy Director position between spring 2009 and 2010; (2) its selection of Lopez for the permanent Deputy Director position in October 2011; and (3) its subsequent transfer of Savage to the Records Management position.  The same is true for Savage's post-complaint performance evaluations, as there is evidence that these evaluations were used to determine monetary awards and raises.  See Pl.'s MTD Exs. at 139; Steele v. Schafer, 535 F.3d 689, 696 (D.C. Cir. 2008) (finding a low performance evaluation cognizable when it led to a low performance bonus); cf.

_____

[9] In her original and amended complaints, Savage refers to a February 2009 EEOC complaint, but there is no evidence of that complaint in the record.  That is of no consequence to her retaliation claim, however, because all of the allegedly adverse actions took place after April 2009.

Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008) ("[P]erformance reviews typically constitute adverse actions only when attached to financial harms.").[10]

　　　With respect to the actions that a jury could find materially adverse, the question remains whether Savage has introduced enough evidence to show that she faced these adverse actions because of retaliatory animus and not for the benign reasons offered by the Department. Although it is a close question, the Court finds that she has.  First and foremost, Savage cites an affidavit from another Department employee, William Porter, describing Petillo's behavior toward Savage shortly after she spoke with an investigator about Porter's EEOC complaint.  See Pl.'s Opp'n Mot Summ. J. Ex. 8.  Porter stated that "Ms. Savage seemed to be treated worse, after she had spoken to an EEO investigator, who interviewed her with respect to my case.  After she testified to the investigator that she believed that I had been discriminated against, it seemed that Mr. Petillo came at her harder."  Id. at ¶ 11.  He also stated that, "[a]s soon as" Savage filed her own complaint with the EEOC, Petillo remarked in a meeting that "some people think they know it all," and that "everyone present knew that he was referring to Ms. Savage."  Id. ¶ 7. This testimony certainly could be more specific—what exactly does it mean, for example, that Petillo "came at [Savage] harder?"  But it is nonetheless "circumstantial evidence of [Savage's] supervisors' intent," and thus it supports an argument that the Department took action against her because of her complaints to the EEOC.  Drielak, 209 F. Supp. 3d at 242.  In other words, this evidence tends to undercut the Department's asserted nondiscriminatory reason for each action—

---

[10] The same cannot be said for the alleged denial of resources and training.  Courts in this Circuit have held that these sorts of denials are generally not materially adverse even in the retaliation context.  See, e.g., Allen v. Napolitano, 774 F. Supp. 2d 186, 203–04 (D.D.C. 2011). Savage does not point to any evidence suggesting that the Department's alleged denial here had consequences any more concrete than the denials in those cases, such that they would discourage a reasonable employee from reporting unlawful discrimination.

reasons that held weight in the discrimination context because they were not rebutted by any evidence of discriminatory intent, but are challenged here by Porter's testimony.

Moreover, while the temporal proximity between Savage's EEOC complaints and the alleged adverse actions might not *itself* suffice to get her retaliation claim to a jury, the timing here provides further evidence that the Department was motivated by Savage's EEOC complaints. That is particularly true when it comes to her performance evaluations: Before April 2009, she received at least one "outstanding" rating in her performance reviews, but never received another such rating after April 2009. And all of the allegedly adverse actions occurred within six months of her filing of the April 2009 or April 2011 EEOC complaint—again, a period that is not so short so as to *alone* establish a causal link between the protected activity and the adverse actions, see Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam), but not so long that it negates the testimonial evidence in her favor, cf. id. at 273–74 (citing a 20-month gap as suggesting a lack of causality).

The Department's arguments on this front focus primarily on Porter's credibility. See Def.'s Reply at 20–21. Those arguments may well carry the day, but they should be directed to the jury, not to the Court. A reasonable jury could hear Porter's testimony and—combined with the fact that all of the alleged adverse actions occurred within six months of complaints in April 2009 and April 2011—could conclude that the Department's actual reason for taking these adverse actions was retaliatory animus.

The Court therefore denies summary judgment with respect to Savage's claims that the following employment actions were taken in retaliation for complaining of race, sex, or disability discrimination: (1) the denial of a transfer out of her division; (2) its selection of Lopez for the

permanent Deputy Director position; (3) its decision to give her lower performance evaluations than before the EEOC complaint; and (4) its subsequent transfer of Savage out of her division.

C. Accommodation Claims

Finally, Savage claims that the Department denied her reasonable accommodations for her disability in violation of the Rehabilitation Act. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by a federal agency "solely by reason of her or his disability." 29 U.S.C. § 794(a). With exceptions not relevant here, that means that an employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); see 29 U.S.C. § 794(d). Reasonable accommodations can include modified workplace facilities and part-time or modified work schedules. 42 U.S.C. § 12111(9).

To succeed on her Rehabilitation Act claim, Savage would need to show that (1) she was a qualified individual with a disability, (2) the Department had notice of her disability and (3) the Department denied her request for a reasonable accommodation. Stewart v. St. Elizabeths Hosp., 589 F.3d 1305, 1307–08 (D.C. Cit. 2010). The Court will assume (without deciding) that Savage has introduced evidence of the first two elements, and that the approximately six-month delay between her request and the Department's ultimate provision of the requested accommodations could, in theory, qualify as a "denial" of the accommodations. Savage's claim fails nevertheless. The D.C. Circuit has said that, as a matter of law, an employer is not liable for denying an accommodation request if it participated "in good faith" in an "interactive process" aimed to satisfy the request. Ward v. McDonald, 762 F.3d 24, 32 (D.C. Cir. 2014); see also Ali v. McCarthy, 179 F. Supp. 3d 54, 77 (D.D.C. 2016) ("The goal underlying the interactive process is for both parties to reach agreement on the appropriate reasonable accommodation and, to the

extent necessary, for the employer to determine whether the employee does indeed have a qualifying disability under the Rehabilitation Act."). Thus, to survive summary judgment, Savage would need to introduce evidence from which a reasonable jury could find that the Department "ended the interactive process or that it participated in the process in bad faith." Ward, 762 F.3d at 32.

She has not done so. The back-and-forth process detailed in the record would not allow a reasonable jury to conclude that the Department ended the dialogue or participated in bad faith. In the case of Savage's teleworking request, the delay in the process was caused by the unresponsiveness of Savage's physician, not by the Department; once Savage sent her MRI results to Petillo, her telework request was granted immediately. See Ward, 762 F.3d at 31 ("[A]n employer needs information about the individual's disability and the desired accommodation—information typically possessed only by the individual or her physician."). Regarding Savage's request for a larger office, the Department moved her to successively larger spaces and, all the while, kept a lookout for possible alternative options. And with Savage's request for ergonomic equipment, the record admits of only one narrative: a third-party vendor delivered the equipment late, but after that initial hiccup the Department's administrators communicated consistently with Savage to address all subsequent problems with delivery and installation. Nowhere during these processes did the Department, for example, withhold "missing information" that only it could provide, or engage in any other behavior that "obstruct[ed] or delay[ed] the interactive process." Ward, 762 F.3d at 32 (quoting EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 805 (7th Cir. 2005)). Rather, with all three accommodations, the "interactive process" appears to have ended in summer 2011, with no indication in the record that any of Savage's specific requests remained unsatisfied at that time.

The Court will grant summary judgment on Savage's claims that the Department denied her reasonable accommodations in violation of the Rehabilitation Act.

## IV. Conclusion

To summarize: The Court will deny summary judgment on Savage's claims (1) that the Department's refusal to transfer her out of her position was unlawful discrimination on the basis of race or sex in violation of Title VII; and (2) that the Department's refusal to transfer her, its selection of Lopez for the Deputy Director position, its grant of lower performance evaluations, and its subsequent transfer of Savage out of the division were unlawful retaliation in violation of Title VII or the Rehabilitation Act. The Court will grant summary judgment on all of her other claims.

The Court will also grant Defendant's motion for leave to exceed its page limitation and deny Plaintiff's motion to strike Defendant's motion and affidavits accompanying that motion.

A separate Order accompanies this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  March 28, 2018